Good morning, counsel. We have one case for argument this morning. Number 21-1970 Casey Voigt et al. versus U.S. EPA et al. Mr. Broughton, I think you're up first this morning and we're ready when you are. Thank you. Good morning. May it please the court. My name is Derek Broughton, and I represent the petitioners Casey and Julie Voigt. Casey and Julie run a cattle ranch and a herd of cattle in central North Dakota in Mercer County. The Coyote Creek Mine is operated alongside the Voigt Ranch, sometimes on top of the Voigt Ranch, and Coyote Station, run by interviewer Otter Tail, is right over the fence from the Voigt Ranch. I want to talk about some of that. First, I want to very briefly thank your honors in the Eighth Circuit for holding these arguments remotely, as well as for having flexibility with the scheduling with the parties. I am unfortunately stuck at home in my basement with a positive COVID test now, so it turned out very well for me that we were doing this remotely or I would have had a rough week. So I appreciate the court's flexibility and wanted to mention that. I also will say my home setup is not ideal, so at times I'll be looking at the judges, but that means I won't be looking at my camera, so I apologize. It's not that I don't intend to look you in the eye, it bothers me, so I just wanted to mention that. Getting into the issues, though, the issues I intend to discuss are going to be some complicated federal law, but first I think it's important to know why this case is in front of this court. And it's because there's very real people dealing with some very real impacts to their cattle ranch, and so this isn't a question of an environmental group and the EPA arguing about what deference means. This is Casey and Julie Voigt trying to run a cattle herd and having some very real problems doing that with what is happening, and what's happening is specifically related to particulate matter and dust pollution on their ranch. The best way to sum this up is in our addendum at 22 and 23. There are some pictures and descriptions of this, and putting aside the pictures of the dust, the other things that Voigt's are facing is Julie having to wake up every morning and scrape the dust off of the watering tank for her horses. These are the issues that we're trying to address, and I think it's important to start there because from here I'm going to get into some very complicated minutiae in federal environmental law, and I don't want to lose sight of what we're really here for and what we're seeking. In this case, we're really dealing with a single source determination, and what I mean by that is that we have to start by looking at what is the source, and the parties agree on a few things. We agree that whatever the rigs are, whether it's Title V or NSR, generally it's the same definition and test, and you look at three criteria. Are they located on one or more continuous or adjacent properties? Same industrial grouping, and then the one that is really in dispute here is... Counsel, this is Judge Loken. I don't quite understand how the single source determination in this appeal does anything to the impact on the cattle on the ranch that you started out with. Sure, and so if they are under a single source, as you can see in the record, what it means is that they're going to need to apply BACT, Best Available Control Technology, throughout the mine in order to control these fugitive emissions from the mine that are impacting the Voight Ranch. So that is the very concrete tie is that they're... And I think they dispute this, but you can see from Mr. Tolme and the record at Joint Appendix 186, it starts. There's some commentary where the power plant and the mine are discussing permitting implications and who should get what permit, and then they go into actual emissions calculations of, well, this is what's going to happen to the plant if we have this coal plant on our property, and it's going to increase, and it's going to become a major modification, and we'd have to apply BACT, so we're going to put it over there. That's our point, is that you should, because it was a major modification, and BACT should apply, and that would help us address the fugitive emissions coming from the mine and onto the Voight property. So what I had said is that we all agree that that is the legal issue for this court to look at. That is the legal issue that DEQ needed to look at, and that is the legal issue that EPA needed to look at, and that they all did look at, and it's simply a question under the criteria, are they under the control of the same person or persons under common control? Thus far, we agree. We also agree that in order to determine that, we all should look at the Meadowbrook letter. The Meadowbrook letter is guidance from the EPA on this precise issue and how to make a determination on this precise issue under the Clean Air Act. Literally could not be more on point, but we all agree. What circuit court case says that it's binding on state regulatory agencies? The EPA says the contrary. Well, but they're wrong. It's guidance that is not binding on state regulatory agencies. That's wrong. Do you disagree with that? I absolutely disagree with that. What's your authority, though? I find we disagree. What's your legal authority for a position that's contrary to both agencies? I don't think it is contrary to both agencies, and here's why. The North Dakota... No, no. Please answer my question. Your legal authority for your position regarding the Meadowbrook letter. My legal authority is the North Dakota administrative code provisions that are verbatim. They are the same provisions as the federal provisions that the EPA is interpreting in the Meadowbrook guidance. There is no... Didn't the North Dakota agency claim to be applying the Meadowbrook letter? Yes, and they also... Everybody agreed that that was the standard. What is your position as to what error EPA made? We're already six minutes in. You've not even touched on what you think was the error by the EPA. Could you get to that before you run out of time? Absolutely, Your Honor. What the EPA did here is say they made this determination that in interpreting the word demonstrate that we didn't address or engage the rationale of the DEQ. If you look at the EPA's order itself, they agree with us that what we said in our petition is sufficient under the Meadowbrook guidance. It is sufficient, that provision in the LSA, that is sufficient to demonstrate common control. The other thing the EPA said in its order is that nothing the DEQ said in response to anything both we and the EPA told the DEQ, none of that changes what we said in the petition, meaning what we said in the petition remains sufficient to establish common control. So this idea that we didn't engage the rationale is artifice. The rationale was fully and frontally engaged by our original petition. We didn't change it because we didn't need to because it remained sufficient to establish common control. The EPA said that literally in its order, refusing to object. That's the bottom line, and if you look at our petition in the LSA, so the things we DEQ and the EPA, they agreed the Meadowbrook guidance applies, they applied the Meadowbrook guidance, and in doing so, they looked at common control and they looked at the Lignite Sales Agreement. We all looked at these things exactly the same. So where do we depart? The Lignite Sales Agreement requires them to submit a mining plan. Now the EPA and the others say, well, it's just a mining plan. It's not just a mining plan. This requires a level of detail that includes estimated capital budget containing detailed itemized estimates of all capital expenditures. Literally all capital expenditures have to be approved or disapproved by the station on an annual basis. The mine has to submit estimated monthly cash flow statements and a projection of the next four years of operations in such detail as directed by Coyote Station. Councilman, I mean, that's just repeating your briefs and your petition. It doesn't get at the EPA's reasoning why it did not have to grant an objection when the state agency concluded it had a different perspective on the LSA. Here's my answer to that, and I'll be done and I can answer it very briefly with authority. It's Sierra Club v. Johnson 1, the first Sierra Club v. Johnson case. That court, the 11th Clean Air Act, and EPA's own regulations do not allow EPA unfettered discretion to ignore obvious violations of Title V permit program requirements. They talk about demonstration and Chevron deference, and then they quote to this conference report from this provision, and they say, if that were not otherwise clear, the conference report for the 1990 amendment settles it. And that conference report says, Section 7661 DB2 sets out clearly the procedures required of EPA in reviewing permits. Simply put, EPA is required to object to permits that violate the Clean Air Act. The duty is non-discretionary. The 11th Circuit stopped there. If you go to, and that's at 1280, 436, F3rd, 1269, 1280, you finish that conference report. Council, you just talked so fast that we might as well not even be here. You rattled haven't given a citation. Sierra Club v. Johnson, 436, F3rd, 1269. Is it in your brief? That is in the brief. Okay. What is not in the brief is the remaining paragraph of that conference report, which states, and this is Congress on the very provision that's at issue in this case, and this is Congress saying. Is this cited in your brief? This part of the conference report. Yes. It's in the brief. The citation to this page is in the brief. What is not quoted in the brief is this. In such a suit, such as this, the court could compel the administrator to object to the permit. Courts in such citizens suits are as capable as is the administrator to review the merits of the petition and determine if an objection should be entered to the permit. Accordingly, courts in such suits should grant no deference to the views of the administrator and should review the merits of the petition de novo in order to arrive at its determination whether to order the administrator to issue an objection to the permit. The EPA has an independent obligation to review whether or not this permit complies and it did not do that. It said in its order, refusing to object... Counselor, you're talking so fast. What I hear you saying is that a congressional conference report, we are required to follow a congressional conference report which says ignore Chevron and otherwise governing Supreme Court Administrative Law Authority. I disagree. That's what I heard you just say. Okay, Your Honor, that's not what I heard. A congressional conference report says that EPA has an independent obligation, as does this court, to review the petition and determine whether the permit complies with the law. They determined that it did not, but they deferred to the DEQ for no reason. Hold on a second. I thought your argument was that the EPA erred because it didn't even get to the merits of the permit. It just made a point that the petition was inadequate because it didn't address the specific LSA provisions that the state relied on and instead argued other LSA provisions. And I thought the issue before us is whether that's arbitrary or capricious reasoning such that the case should be sent back to the agency for the agency to actually grapple with the merits. Now, do I understand that correctly? That's right, Your Honor. You do understand that correctly. That's what we asked for in our briefing. What I'm saying is under this conference committee report, if we're saying the word demonstrates is ambiguous, then this is the best evidence we have of Congress's intent. And the intent was that this court can make its own determination. And I think this court has a choice as to whether or not to vacate and remand for further proceedings or require them to object. And with that, unless there's other questions, I'd like to reserve the remainder of my time. Well, I do have one question and it's my only question. For clarification, would you agree that the voice petition does not specifically address the content of this four-page filing by the Department of Health that makes reference to stationary source determination? It does not explicitly reference the content of the stationary source determination, but my distinction is that it does address it because it sets out a sufficient condition that is unaffected by that four-page document or anything in it. I would like to reserve the remainder of my time. I would like to know if you have a case where a court has directed the EPA to object. Your Honor, I would have to get back to you, but I do believe one of the primary cases discussing this issue about the word demonstrate, I think that one of those circuit cases did order them to object. In your rebuttal time, I'd like the citation to that because that's an extraordinary remedy. I want to reserve the remainder of my time and did so following the judge's questions. Mr. Mitchell? Yes, Your Honor. One moment, I'm getting my screen back in order. Thank you. Your Honors, and may it please the court, my name is David Mitchell and I represent respondent EPA in this matter. EPA will be sharing at least four minutes of respondent's oral argument time with interveners in support of EPA. We also thank you for your flexibility in scheduling this oral argument. This court should deny the VOTS petition because first, the VOTS did not address North Dakota's reasoning and the source determination responding to their 2018 comment on the permanent issue here. Second, the VOTS waived any objections to the public participation North Dakota provided. North Dakota was not required to reissue the permit for public comment. And third, EPA did not require the VOTS to respond to North Dakota's September 2020 letter submitted after the VOTS petition. Counsel, you're now the second attorney this morning talking faster than my old ears can keep up with. Yes, Your Honor. I will slow down my pace. I want to first address the legal authority issues that you brought up and petitioner's argument here. Because from EPA's perspective, there is a regulation that has been passed and is final in this case and not subject to judicial review. That regulation is a 40 CFR 70.12A26, which provides that a petitioner must explain how the permanent authority's response to a petitioner's comment is inadequate to address the issues raised in the public comment. This regulation implemented EPA's long-held position that the demonstration burden that a petitioner must meet in order to establish non-compliance with the Clean Air Act under 42 USC 7661DB2. The regulation served to give notice to the public that this was an irreducible minimum that was required in order to meet the demonstration burden. EPA has applied this interpretation and orders for well over a decade, whereby if a petitioner did not respond to the reasoning of a permitting authority, particularly in a response to a comment, and particularly here where we have a highly fact-specific determination in the area of common control, that it did not meet the demonstration burden. Why isn't it an explanation of inadequacy to say that the state ignored the relevant factors in the LSA, the factors that EPA itself said were relevant? Your Honor, because under the regulation and EPA's view on its plain face, it requires some engagement with the permitting authority's reasoning and there has to be engagement with the factors. On a particular note, North Dakota did a holistic source determination here. It was not only the Lignite Sales Agreement that they analyzed. They also pointed to additional factors, the existence of state and federal air pollution control requirements that operated independently at the mine and the power plant. And it also pointed to its observations that the operations at the mine were indeed independent of the power plant. So to say that analysis of the LSA was the only factors that North Dakota considered is just factually wrong under the record. And you can look at the analysis in our Addendum 5-8 of the Joint Appendix 499-502. Well, that wasn't really my question. I don't think I asked whether the state mentioned only the LSA. My question was, why isn't an explanation of inadequacy to say that the state ignored important provisions of the LSA that demonstrate common control? Your Honor, because at a bare minimum, in order to explain inadequacy, where you have a state agency that is responsible for determining the permit provisions and issuing the permit in the first instance, there needs to be some engagement with the factors that the state agency actually considered, particularly here in a highly fact specific common control. If you look at the spectrum of what a petitioner could do when they respond, they could say, we simply disagree. We disagree with what the state agency said. Now that's clearly inadequate. Or you could have, on the other end, somebody that in excruciating detail discusses every factor and rebuts them and discusses the factors in conjunction. That clearly would be sufficient to address the reasoning. EPA really has established a minimum standard here. At a minimum, you have to address and grapple with, you have to explain the inadequacy, considering the reasoning that the permitting authority actually provided. This is certainly a reasonable interpretation of the regulatory language when considering the cooperative federalism structure of the Clean Air Act. North Dakota is the permitting authority. It is not EPA. As the Supreme Court has noted, it is not EPA's role to sit as a super permitting authority, conduct an entirely new de novo review, particularly here when you're in a highly fact specific scenario of common control. The analysis needs to be properly limited. In that context, EPA has long interpreted that at a minimum, a petitioner needs to engage with the reasoning and discuss the reasoning that the state actually provides. In this case, the boss did not do that. They simply restated an analysis that they provided in their 2019 petition. You can compare those analyses in EPA's addendum in pages 1-4 and pages 9-12. You will see that they're exactly the same. After North Dakota issued that source determination, there was a requirement under the regulation that the boss actually grapple with, address the reasoning that North Dakota provided. They simply did not do that. Under the regulation, this is an irreducible minimum requirement. Courts have upheld this interpretation at the statutory level. Not in the Eighth Circuit, but the McClaren v. EPA case upheld the interpretation. Do you have a case where the objection wasn't a quarrel with the reasoning of the agency, but an argument that the state ignored factors that would have been conclusive in showing common control? Do you have a case that says that's an insufficient objection under the regulation? Your Honor, no. We do not have a case that has that specific scenario. In this context, there was no finding here by EPA. This is a correction that I think needs to be made. EPA did not do an independent analysis of North Dakota's common control analysis under their state program. What EPA did was they provided some comment and guidance on how they would have applied their guidance if they were the permitting authority in the first instance. They did not issue a determination on reasonableness. They did not issue a determination on how they would have decided the common control question if they were reviewing this as the permitting authority in the first instance. What they did is they applied the regulation, a minimum irreducible requirement, that in order to meet the demonstration burden, there needed to be some engagement with the permitting authority's reasoning. They went on to explain that if they were the permitting authority, they may have considered different factors more relevant than North Dakota. But that doesn't change the fact that the regulatory requirement that EPA codified was not met here. Mr. Mitchell, let me ask you, and I don't expect an answer one way or another, but have you given any thought to whether the EPA case recently argued before the Supreme Court, I think in the last week or so, is potentially relevant or significant to this case? Your Honor, if you're referring to the case that was argued on Monday, the West Virginia case, we don't view that case as relevant here. It's pretty far afield of the issue that's going on here. Okay. So, no, Your Honor. Say, Mr. Mitchell, regarding the September 29, 2020 letter, what do we know about how that came about? What led the state to send a follow-up letter? Was there some inquiry from the EPA? It says at the beginning, it's come to our attention that EPA may want more information. Do we have a background to that? Your Honor, yes, there was an inquiry from EPA to North Dakota asking for more information. However, those inquiries simply are not relevant to the inquiry here. When you look at the face of the order... Where would that be in the record, in the appendix, the inquiry from EPA? Do you know? Your Honor, yes, I believe... Is this the one that was redacted in a FOIA request and made reference to the problematic permit? Your Honor, I'm not... I don't... I'd have to look through the joint appendix to see this. All right. Go ahead, then. Go ahead. I don't want to take your time looking through it. Sure. What I do know, Your Honor, though, is that when you look at the order, the justification that EPA relied on was that... in the April 2020 source determination. It's hard to see how, if the court were to remand on this issue, that there would be any change here. And we would be here just a few months later with a slightly different order. And, Your Honor, I see that my time is concluding. Unless you have any further questions for EPA, I would turn it over to interveners on behalf of EPA. Very good. Mr... Let's see. Mr. Jader. Thank you. Jack. Thank you, Your Honor. Let me address real quick the last question that Judge Colton asked about the problematic permit and that communication. That communication happened after the first petition to object and after the first permit that was submitted. It was not related to the second action. And I don't know exactly how EPA asked the agency about further information. But about consideration of the LSA provisions that EPA had signed in its letters, which are the same that the petitioner signed here. But it might have been an oral communication or an e-mail. I don't know. But what I can tell you also is that regardless of that, the fact of the matter is that the record as a whole very clearly demonstrates that the inquiry from EPA on this issue was completely irrelevant. And that the agency, the state agency, definitely considered the provisions that EPA and the petitioners cited. In fact, thanks to the petitioner's FOIA request, we have in the record several draft determinations that the agency had prepared. And these are at Joint Appendix. They start at Joint Appendix 820, page 841 and 846. Each one of those determinations actually looked at the very specific provisions that were cited by the petitioners and explained why they did not find them convincing to get a common control determination. At least they clearly show that the agency very carefully considered them. In fact, I will point out to you something more on that. At page 850 of the Joint Appendix, which is within one of those provisions, one of those memos, the agency actually looked at LSA section 18.4, which no party had actually ever mentioned to it. Not even TCMC, the mine, or the intervenors, the plant owners. And that provision very clearly shows that even under the mining plan, which the petitioners make a lot of in terms of control, even under that, Coyote Station does not have any authority to require the mine to do anything other than to comply with its environmental obligations. So I took a lot of my time, and I don't have a lot, to address this question. But let me continue on this. In our view, it's clear that the determination is reasonable. The agency looked at four factors. These factors are that CCMC has its own permit. It sets the applicable requirements. Coyote Station does not have any kind of role in determining what those applicable requirements are for the mine. And no mining plan. And that, by the way, that permit was obtained before there was ever a mining plan, because it was at the beginning of the, before the plant was constructed even. I mean, the mine was constructed. And no mining plan is going to make any difference in what applicable requirements are going to apply to this mine. Second, the intent of the contract in LSA section 21 is clear. The parties are separate. They each have their duties and obligations and responsibilities. Third, the state has observed that in actual practice. And finally, the contract makes clear that in terms of inspections, that Coyote Station does have the right to do in order to make sure that the mining plan is followed, and it gets the call that it wants, does not give Coyote Station the authority to control anything related to operational requirements or actions, which are what determines actual compliance with the regulations, with the permit and the regulations. I see that my time has ended. So unless there are any questions, I will stop. Thank you, counsel. I'll give you two minutes for rebuttal, Mr. Brun. Thank you, Your Honor. I would first point out that we are now apparently being asked to have responded to a draft memo that was never even submitted to EPA, and to an arbitration clause in that draft memo and the DEQ's analysis of that. My main point, however, is that what Mr. Mitchell just said for the EPA results in one of two conclusions. Either the EPA did not do its job and consider this, which is what he said, and it needs to be remanded for them to do their job, or they've sufficiently done the job and agreed with the petitioners such that this court can. The order itself, the last two pages of the order, go through those four things that Mr. Jaber just referenced. And what the EPA says is that, yes, we understand that you have to get a permit and the DEQ has to approve changes to the permit. That's literally self-evident. They said, but the more relevant inquiry under Meadowbrook is whether Kyle Station has the authority to set that process in motion. Whether or not CCMC, the mine, is responsible for compliance with these requirements, this is the EPA's words, does not speak to what the EPA would consider the more important issue. Literally, they said, this is the more important issue under our Meadowbrook guidance, whether Kyle Station can dictate whether the mine complies with these requirements. DEQ's observations of what's happening on the ground at the mine. Again, it's the power or authority to dictate relevant decisions, not the exercise of actual control each day. That's our point. We established that. That's sufficient. Nothing the DEQ says about arbitration clauses or responsibility as between the parties affects that. What we're saying is Kyle Station has power and authority to control the mine. Period. EPA, in the last two pages of their order, agrees with us. Either they agree with us and had an opportunity and an obligation to object. If they don't agree with us, they need to do this analysis because everything they put in their order agrees with us. The only thing I'll also say is the NYPIRG v. Whitman case did not direct them to object. It vacated and remanded. They were asking for them to send instructions to object. It did not actually provide that relief. I would say, though, looking at that case, the court did not say they could not do that. They said in that case they would not. Without any other questions, I'll rest with that. Thank you, your honors. Very good, counsel. The case is complex. It's been thoroughly briefed and healthfully argued this morning and we'll take it under advisement. Thank you, your honors.